Filed 7/17/26  P. v. Contreras CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084485 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD205434) |
| v. | |
| SERGIO CONTRERAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Special circumstance findings vacated in part; judgment otherwise affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Seth M. Friedman and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

One night during Labor Day weekend in 2000, Sergio Contreras gave Michael Plummer $30 worth of meth.  When Plummer refused to pay,

Contreras fired more than a dozen rounds into Plummer's apartment, killing Plummer, his 18-year-old friend, and his one-year-old nephew.

After the shooting, law enforcement immediately suspected Contreras based on the drug deal gone bad. But at that time, there were no witnesses to confirm that he was the shooter, and no physical evidence tying him to the scene. The case went cold until the partner of Contreras's coparticipant, Victor Calderon, reported them to law enforcement. This reactivated the investigation, and murder charges were filed against Contreras soon after that. But then came another wrinkle: Contreras was serving a lengthy prison sentence in Mexico under a different name. Local law enforcement successfully sought Contreras's extradition, but the process took years, and Calderon died in the meantime. Trial ultimately began in March 2024.

On appeal, Contreras challenges the nearly 23-year delay between the shooting and his prosecution. He maintains that Calderon's death prejudiced his defense. We conclude the trial court fairly rejected his motion to dismiss the case based on pre- and post-charging delay, as the record supports its findings that the reasons for the delay outweighed the asserted prejudice. Indeed, Calderon consistently identified Contreras as the shooter.

Contreras also contends the trial court erred in making two evidentiary rulings, in answering a question the jury sent out during deliberations, and in permitting duplicative multiple-murder special circumstance findings. For reasons we explain, we agree that two of the special circumstance findings must be vacated, but otherwise reject his claims and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Shooting*

In September 2000, Julio Rangel, Sr., his partner Michelle Rayo, their seven-year-old daughter Michelle ("Mimi"), and their one-year-old son Julio

2

Rangel, Jr. ("Julito") had been living in a one-bedroom apartment on Bancroft Street in Normal Heights for about three months. Plummer, Rayo's older brother, had been staying with them for about a month as well.

Vanessa Madrid lived in the apartment next door with her mother figure, Donna Dement. At the time of the shooting, Dement's niece Charlene Horsley and Horsley's boyfriend Brian Haslip were also staying there. Madrid had recently started dating Contreras. Rangel and Rayo had noticed Contreras spending time with Madrid.

On Labor Day that year, the Rangel-Rayo family spent the day grilling and watching football. Plummer's friend, 18-year-old Adah Pearson, came over to join the festivities. Plummer was "messing around" with an inoperative BB gun that looked like "a black automatic" that day. He carried it around in his waistband, beneath his shirt. Meanwhile, Madrid and Contreras were spending the day together.

Around 8:00 or 9:00 p.m., Plummer got about $20 or $30 worth of meth from Contreras but did not pay. Rayo was worried because she did not know what Contreras was "capable of doing." She urged Plummer to pay Contreras and offered to give him some money, but he refused.

Contreras was mad and felt disrespected. He asked Madrid to knock on her neighbors' door and collect the money. When she did so, Plummer indicated he would not pay—saying something to the effect of "kiss my ass"—and shut the door. This made Contreras "very mad." Madrid and Contreras parted ways soon after that.

By 11:00 p.m., the children were asleep in the bedroom, Pearson was asleep on the couch in the living room, and Rangel, Rayo, and Plummer were in or near the kitchen. Suddenly, the front door opened. Plummer rushed to the door, Rangel heard "a little bit of confrontation like pushing and

3

grunting," and then several shots were fired. Rangel and Rayo dropped to the floor. When the shooting stopped, they saw Plummer dead on the ground near the doorway. He was shot 12 times in the front and back of his body, and in his head. The BB gun was lying on the ground beside him, between his arm and his waist. Pearson had been shot in her chest, but she was still breathing and groaning. Rayo rushed to the bedroom and saw that Julito had been shot in the back of his head, but he remained conscious. Rangel called 911. Pearson and Julito were taken to the hospital, where they soon succumbed to their injuries.

B.     *Initial Investigation*

Neither Rangel nor Rayo saw the shooter. Rayo only saw the long barrel of a gun coming through the door. But they immediately suspected Contreras based on the earlier dispute about the drugs. In his 911 call, Rangel described the shooter as a "20 something" "Hispanic" or "Mexican" wearing a white shirt and blue pants. He shouted that the people next door knew who did this.

When the police arrived, there was "some chatter" in "the crowd" that Madrid might know the shooter. An officer located Madrid and she told him about Contreras and asking the neighbor for money. She told police that Contreras was wearing a plain blue shirt, a black sweater, baggy jeans, and white tennis shoes.

Madrid's roommates at the time, Horsley and Haslip, were visiting a friend in an upstairs unit of the same apartment complex at the time of the shooting. Haslip heard the gunshots, looked outside, and saw one person running away. He saw a "flash of white" that could have been a shirt. Horsley heard four or five gunshots and then saw "two males running in their courtyard." According to her description, one was a Black or Hispanic male

4

with a white bandana or nylon cap and the second was a Hispanic male wearing a blue shirt and carrying "some type of 2x4 or stick."

Two women who shared an apartment across the street also heard the shooting. When the shooting stopped, one of the women looked outside and saw somebody get into a van and drive down the alley behind the Bancroft Street apartments. Her roommate heard two vehicles speeding away. Earlier that night, she had noticed an unfamiliar maroon van parked nearby. There was a "tan" man wearing a "nice" shirt talking loudly on the phone inside the van.

Police found blood drops leading from the apartment complex to the adjacent alley. There were two .22 caliber casings found inside the apartment—on a windowsill next to the front door and on the ground near the kitchen—and 14 found outside. There were bullet holes in the front door, the couch, the wall dividing the living room and bedroom, and the bedroom wall. The shots appeared to come from outside the front door and were all fired from the same weapon, likely a Marlin rifle.

Based on the witness interviews, the police immediately focused on Contreras. A composite drawing of him was broadcast on the news. But the police were unable to find him until August 2003, when they learned that he was in federal immigration custody in El Centro, California. In an interview with local police, Contreras denied knowing Madrid, Plummer, or Calderon and denied having any issues related to drugs. He claimed to be in Mexico at the time of the shooting. The police obtained a DNA sample from Contreras and had it compared to the blood trail left at the crime scene. He was not a match.

Contreras remained the prime suspect, and the police suspected he had an accomplice. But without a witness identifying Contreras as the shooter or

physical evidence placing him at the scene, Detective Stephen McDonald decided to inactivate the case in June 2004.

C.    *A Break in The Case*

The case remained inactive until February 2005, when a district attorney (DA) investigator from Talladega, Alabama, Mike McBurnett, contacted Detective McDonald.  In Talladega, a man named Victor Calderon had been recently convicted of vehicular homicide.  In connection with that case, McBurnett contacted Calderon's partner, Diana Gonzalez.  In addition to discussing the Talladega case, Gonzalez told McBurnett that Calderon was involved in a shooting in San Diego.  The shooting had always haunted her, but she did not feel safe telling the police about it until Calderon, who abused her, was in prison.  The following month, McDonald traveled to Talladega to interview Gonzalez and Calderon.

According to Gonzalez, she and Calderon lived in San Diego in 2000.  In the months preceding the shooting, Contreras—whom she identified in a photographic lineup—visited their home multiple times, and at some point, she saw Calderon and Contreras in the backyard cutting a shotgun down.  On the evening of the shooting, Contreras came by the house looking for Calderon, but he was not home.  Contreras asked Gonzalez to have Calderon call him, stating it was "an emergency."  When Calderon returned less than an hour later, Gonzalez relayed the message, and Calderon left again.

Later that night, she woke up to the sounds of sirens and helicopters. She looked outside and saw Calderon running down the street with his shirt—a blue Hawaiian shirt—wrapped around his arm, which was bleeding profusely.  He came inside and walked through the house straight to the backyard.  Peering out a back window, Gonzalez saw Contreras and an older, bald, "heavyset" man join Calderon in the yard.  Calderon burned his shirt on

6

the grill and the older man took a gun from Calderon or Contreras and then left. Gonzalez heard Calderon call Contreras a "dumbass" and blame him for the wound in his arm. Contreras replied that "[h]e didn't mean to" but Calderon "got in the way."

Gonzalez then turned on the news and learned there had been a shooting. When Calderon and Contreras came inside, Gonzalez asked Calderon whether they had something to do with the shooting. Initially, the men did not respond. Gonzalez asked again, and Calderon explained that he had given Contreras some drugs to sell, but the "guy" did not pay. They went to the guy's home, and when he opened the door, Calderon stabbed him with an ice pick while Conteras started shooting.[1] At some point during this conversation, Contreras left the house.

Contreras returned the next morning with his mother. Calderon repeated the story for the mother, stating they went to collect some money. The guy refused to pay and began closing the door. Calderon pushed the door open and started stabbing the guy while Contreras started shooting. Contreras, again, did not say anything. Days later, Calderon and Gonzalez moved to Alabama.

Calderon offered a much different version of events. Calderon told McDonald, "Right at the door, he started shooting at the people. I tried to take the rifle and he stepped back and shot me. When he shot me in the hand, I ran." Calderon also stated that Contreras "went over there trying to get money" and he urged Contreras to "forget about the money." When

---

[1] At trial, the medical examiner opined that likely one but potentially up to three of Plummer's nonfatal wounds could have been inflicted by an ice pick.

shown a photo lineup, Calderon identified Contreras as the shooter.
McDonald saw a through-and-through scar on Calderon's right forearm.
Later that same month, March 2005, the blood trail was matched to
Calderon.

DA investigators interviewed Calderon again in October 2006. In this
interview, Calderon provided slightly more and different details to his
account. Calderon stated that he arrived at the apartment complex and
waited for Contreras in his van. After several minutes, he went to see what
was taking Contreras so long. He approached the apartment and saw
Contreras arguing with a man about money. Contreras was holding a sawed-
off rifle down by his leg. Suddenly, he raised the rifle and began shooting.
Calderon tried to take the rifle away from Contreras, but Contreras shot him
in the arm. Calderon then ran away.

D.     *The Charges*

The prosecution filed a felony complaint against Contreras in March
2007. He was charged with three counts of first degree murder (Pen. Code,[2]
§ 187, subd. (a)) and, as to each count, it was alleged that he personally and
intentionally discharged a firearm causing great bodily injury and death (§
12022.53, subd. (d)). The multiple-murder special circumstance (§ 190.2,
subd. (a)(3)) was alleged as to all three counts as well.[3] A warrant for
Contreras's arrest was issued in April 2007.

---

[2]     Further undesignated statutory references are to the Penal Code.

[3]     The prosecution originally alleged the lying-in-wait special
circumstance (§ 190.2, subd. (a)(15)) too but this allegation was removed from
the information before trial.

8

E.   *The Extradition*

In October 2007, law enforcement tried to locate Contreras by name in Mexico, with no success. In April 2010, they asked Mexican authorities to search for him by his fingerprints. This search revealed that since 2009 he had been in custody in Mexico for robbery and homicide under a different name. The following month, in May 2010, local DA investigators met with the prosecutor in the Mexican case and learned that Contreras was serving a 22-year prison sentence. The DA's office proceeded to prepare an extradition request, which was submitted to Mexico in March 2012.

In 2015, while the extradition request was pending, Calderon died.[4]

Contreras's prison sentence was cut short when an appellate court overturned his conviction in Mexico. He was extradited and placed in local custody on March 22, 2023, and arraigned on the complaint two days later. Trial began one year later.

F.   *The Trial*

At trial, an additional witness identified Contreras as the shooter. Madrid's mother figure Dement testified that she heard Contreras and Plummer arguing about a drug deal. She looked outside and saw Contreras with a gun—a small handgun, as she recalled. She hid behind her couch and heard several shots fired. Dement, however, did not tell any of this to the police when she was interviewed at the time of the shooting. She claimed she was afraid of being harmed and did not want to get involved. She moved out of her apartment soon after the shooting.

---

[4]   Before trial, the parties initially stipulated that Calderon died on September 15, 2006. For the rest of trial and on appeal, however, the parties agreed that he died in 2015.

A jury found Contreras guilty as charged and found true all allegations. The trial court sentenced him to three consecutive terms of life without the possibility of parole (LWOP), plus three consecutive terms of 25 years to life for the firearm enhancements.

## DISCUSSION

### A.  *Motion to Dismiss Based on Delayed Prosecution*

Contreras contends the trial court abused its discretion by denying his motion to dismiss the case based on delayed prosecution, violating his rights to a fair trial and to due process of law under the state and federal Constitutions as well as his state constitutional right to a speedy trial.  We conclude the record supports the trial court's determination that any prejudice to Contreras was greatly outweighed by the legitimate reasons for the delay.

### 1.  *Additional Background*

Before jury selection began, Contreras moved to dismiss the case based on pre- and post-charging delay.  In articulating the prejudice he suffered from the delay, he emphasized Calderon's death.  Had Calderon been alive for his trial, Contreras posited, the defense could have elicited testimony about "a third person involved, named Tito or Felipe who looked like Mr. Contreras and who according to Mr. Calderon was in the mix, was involved, was riding with them and who . . . came back with the gun and hid the gun."  Defense counsel suggested that this third person "was maybe at the door instead of [Contreras]" or was "maybe the getaway driver."  The prosecutor, in response, maintained that Calderon would have supported the prosecution more than the defense, since he would have testified that Contreras was the shooter.

As to the pre-charging delay, Contreras argued that law enforcement had sufficient evidence to arrest and charge him with the murders when they

10

located him in El Centro in August 2003, and their failure to do so was unjustified. Even assuming law enforcement did not have enough evidence until Calderon and Gonzalez came forward in March 2005, there was no explanation as to why he was not charged until March 2007. In response, the prosecutor asserted that the pre-charging delay was due to the ongoing investigation. While the police suspected Contreras early on, they did not have physical evidence placing him at the scene nor any witnesses identifying him as the shooter until Gonzalez and Calderon gave their statements and the blood trail was matched to Calderon. Gonzalez and Calderon were re-interviewed in October 2006, and charges were filed against Contreras in March 2007. The prosecutor explained that this process took two years because "this is a serious case" involving multiple murders, and law enforcement was, of course, working on several cases at the same time.

Turning to the post-charging delay, Contreras contended that law enforcement should have tried searching for him by his fingerprints much sooner. Moreover, in his view, there was no justification for why it took two years to prepare the extradition request, and there was no indication that law enforcement "follow[ed] up" on the request to urge Mexico to permit Contreras to stand trial in the United States before his prison sentence was completed in Mexico—a so-called temporary surrender. At the same time, defense counsel conceded that the extradition request was a "big packet" and there was nothing the United States could do to "force" Mexico to release Contreras.

In response, the prosecutor pointed out that searching for Contreras by his fingerprints would have been futile until he entered Mexican custody in 2009. Regarding the extradition request, the prosecutor explained that preparing the request involves an iterative process between the DA's office

and the United States Department of Justice, Office of International Affairs (OIA). Once these agencies agree on the contents of the request, a judge and the DA must approve it, and then the OIA transmits it to Mexico. It is a lengthy, formal process that simply takes time. And although temporary surrender is rarely requested, the OIA considered it in this case. The OIA ultimately decided against pursuing temporary surrender "due to ongoing legal and policy deliberations." In any event, the prosecutor maintained it was speculative to think that Mexico would have agreed to temporary surrender had it been requested, particularly given the seriousness of Contreras's convictions there.

The trial court denied the pretrial motion to dismiss. It saw no prejudice to the defense—it was "so speculative" to think that Calderon would have testified at trial, since he had a Fifth Amendment right against self-incrimination. At the same time, the court found that law enforcement acted reasonably under the circumstances. After the shooting, the police searched for Contreras for years until locating him in immigration custody in August 2003. The court believed "it would have been irresponsible, frankly" to charge Contreras at that point given the state of the evidence. Once Calderon named Contreras as the shooter, and the blood trail was matched to Calderon, law enforcement was "able to pull together a case." The court could not fault the prosecution for the delay in locating Contreras after the complaint was filed, since he was using a different name. And when law enforcement did find Contreras, the subsequent delay was attributable to the fact that he was serving a lengthy sentence in Mexico. The court did not believe the prosecution needed to seek temporary surrender or otherwise "check in" with Mexico.

After trial, Contreras renewed his motion to dismiss. He maintained that he was denied a fair trial because he was unable to cross-examine Calderon "to show the depth of his lies and the deficiencies in his credibility" and explore whether a third person was the shooter. The court denied the motion, noting that it had paid attention to whether actual prejudice to the defense developed during trial, and it detected none. The court did not believe the trial would have been much different had Calderon been available. It otherwise remained convinced that law enforcement acted reasonably.

2.     *The Balancing Test*

"The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging." (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*).) Since the law under the California Constitution "is at least as favorable for" defendants as the law under the United States Constitution in this context, our courts apply California law in assessing such claims. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1251 (*Nelson*).) Under California law, " ' "[a] defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." ' " (*Cowan*, at p. 430.)

Article I, section 15 of our state Constitution also guarantees a defendant's right to a speedy trial in criminal cases. This right is triggered by the filing of a felony complaint. (*People v. Martinez* (2000) 22 Cal.4th 750, 765.) As in the pre-charging context, a defendant asserting a speedy trial

13

violation based on delay occurring between the filing of the complaint and being held to answer must affirmatively demonstrate that the delay prejudiced his ability to defend against the charges. (*Id*. at p. 766.) The court must then weigh the prejudicial effect of the delay against the asserted justification for the delay. (*Id*. at pp. 766–767; see also *id*. at pp. 767–768 [recognizing that the same test is used to analyze claimed due process violations based on pre-charging delay and speedy trial violations based on post-charging delay under the state Constitution].)

Prejudice from delay may take the form of lost material witnesses, faded memories, or lost evidence. (*Cowan, supra*, 50 Cal.4th at p. 430.) The level of prejudice required to establish a constitutional violation depends on the justification for the delay. Since " '[p]urposeful delay to gain advantage is totally unjustified,' " a weaker showing of prejudice may " 'suffice to tip the scales' " toward a violation. (*Id*. at p. 431.) If the delay was merely negligent, a greater showing of prejudice is required. (*Ibid*.) "The justification for the delay is strong when there is 'investigative delay, nothing else.' " (*Ibid*.)

We review the trial court's ruling on a motion to dismiss based on prejudicial delay for abuse of discretion, deferring to its factual findings if supported by substantial evidence. (*Cowan, supra*, 50 Cal.4th at p. 431.)

3.      *Any Prejudice Is Outweighed by The Reasons for Delay*

Here, the trial court reasonably assigned relatively little weight to the prejudice Contreras suffered. In the trial court and on appeal, Contreras has emphasized the intervening death of Calderon. Even assuming Calderon would not have invoked his Fifth Amendment right against self-incrimination at trial, the record indicates that his testimony would have strengthened the prosecution case more than the defense. Based on his statement to DA investigators in 2006, Calderon would have confirmed that Contreras shot

14

Plummer in the head at close range, Plummer did not have a gun, and Contreras proceeded to fire more than a dozen rounds into the apartment.

The notion that Calderon would have supported the defense theory that a third person was the shooter is both a stretch and speculative at best. Contreras relies on portions of Calderon's statements to law enforcement that were excluded from the evidence at trial. (See Section B, *post*.) In particular, Calderon told Detective McDonald that he and "Tito" agreed to follow Contreras to the apartment complex in Tito's white car so that Contreras would have a ride back. When they arrived, Calderon saw Contreras approach the apartment with a rifle. Calderon and Tito followed him to the doorway, where they both tried taking the rifle away. Calderon later told DA investigators that he and Tito followed Contreras to the complex in Calderon's burgundy van. When they arrived, they waited in the van for a while, and then Calderon went to see what was taking so long. He saw Contreras and Plummer arguing about money in the doorway, then Contreras started shooting. Calderon again claimed that he tried taking the rifle to stop Contreras. This time, however, Calderon stated that Tito remained in the van.

Thus, although Calderon could have placed Tito at the scene, there was no basis to think he would have ever testified that Tito was the shooter. Across multiple interviews with law enforcement, he consistently stated that Contreras was the shooter and specifically denied that Tito was the shooter.

Contreras also suggests that the defense was harmed because Calderon's statements were presented to the jury at trial via Gonzalez, yet the defense was unable to discredit Calderon since he was not available for cross-examination. The degree to which the defense might have further discredited Calderon, however, appears marginal. The defense was able to

15

present the heart of the story that Calderon gave to law enforcement—that when Contreras started shooting, he tried taking the rifle, was shot himself, and then ran away—through the testimony of the detective and investigator who interviewed him. This account differed significantly from the version of events Calderon provided to Gonzalez and Contreras's mother, as related by Gonzalez at trial—he and Contreras were selling drugs together, and he stabbed Plummer with an ice pick while Contreras was shooting. Accordingly, the jury could see that Calderon was not always truthful, at least not as to his own involvement in the shooting.

To be sure, Calderon gave law enforcement inconsistent statements on some other details not presented to the jury, such as the vehicle he and Tito drove to the apartments, whether Tito came to the door or remained in the van, and whether he saw Contreras again after the shooting. And he was reluctant to share other information—most notably the extent of his prior relationship with Contreras. But any benefit the defense would have achieved by teasing out these additional inconsistencies would have been greatly overshadowed by Calderon's direct testimony that Contreras was the shooter, the critical point on which he was steadfast.

By contrast, the record amply supports the trial court's finding that the reasons for the delay were relatively strong. The prosecutor affirmed that his office did not believe there was proof beyond a reasonable doubt that Contreras was responsible for the shooting until Gonzalez and Calderon came forward and law enforcement identified the blood trail in March 2005. This makes sense. Up until that point, the prosecution could reasonably show that Contreras had a motive—the drug deal gone bad—and might have been wearing a shirt the same color as the shooter or accomplice. But there was no evidence connecting him to the murder weapon, the blood trail, or the

16

getaway car, and there were no witnesses at that time who would testify they saw Contreras fire a gun. It was not until Gonzalez and Calderon gave their statements that the prosecution had evidence showing Contreras was the shooter and explaining who left the blood trail, how the burgundy minivan was involved, and what happened to the gun. We generally "should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges" (*Nelson, supra*, 43 Cal.4th at p. 1256), and we have no basis to do so here.

The record indicates that after Gonzalez and Calderon came forward in March 2005, law enforcement continued to investigate, as shown by the fact that DA investigators traveled to Alabama to more extensively interview Calderon across two dates in October 2006. Charges were filed soon after that, in March 2007. Perhaps in a perfect world law enforcement could have finished investigating the case and filed charges more quickly after the break in the case. But as the prosecutor represented below, "this is a serious case" involving multiple murders and "these cases don't happen in a vacuum. The detectives have other cases; the district attorneys have other cases." Two years does not strike us as a clearly unreasonable amount of time to prepare a special circumstance murder case for prosecution after a period of inactivity. (See *Nelson, supra*, 43 Cal.4th at p. 1257 ["It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner."].)

The trial court fairly declined to fault the prosecution for the post-charging delay. As the court noted, law enforcement was initially unable to locate Contreras because he was using a different name in Mexico. When he was found, he was in custody for serious offenses there. (See *People v.*

17

*DePriest* (2007) 42 Cal.4th 1, 28 [rejecting state constitutional speedy trial claim where "defendant's actions contributed to much of the foregoing delay"].) The DA's office nonetheless promptly began the extradition request process, and there was nothing derelict about the government showing comity toward Mexico and allowing Contreras to serve his time there without repeated "check ins" on its request. Indeed, formally making the extradition request despite Contreras's lengthy prison sentence facilitated his immediate transfer to local custody when he was released from Mexican custody earlier than expected. (Cf. *id.* at p. 28 [delay was justified where California "showed comity toward Missouri authorities, who had custody of defendant" for serious charges and sought defendant's return "[w]ithin a brief and reasonable time after Missouri finished serially prosecuting" him].)

In sum, while the nearly 23-year delay in prosecuting Contreras was certainly lengthy, the record supports the trial court's determination that the reasons for the delay were reasonable and legitimate, and the prejudice flowing from the delay—the death of Calderon, who would have named Contreras as the shooter—was comparatively weak.

**B.** ***Calderon's Statements to Law Enforcement***

Contreras next argues the trial court erred in excluding certain statements that Calderon made to law enforcement in March 2005 and October 2006, before his death sometime in 2015. We see no error, as the statements were hearsay and Contreras did not establish their admissibility.

As discussed above, Gonzalez came forward in February 2005 and told law enforcement that her partner, Calderon, was involved in a triple homicide in San Diego in 2000. According to her, the night of the shooting, she heard Calderon call Contreras a "dumbass" for shooting his arm, to which Contreras replied that "[h]e didn't mean to" but Calderon "got in the way."

18

When she later saw a news report about the shooting and accused Calderon and Contreras of being involved, Calderon explained that the "guy" refused to pay for his drugs, so they went to his house and Calderon stabbed him with an ice pick while Contreras was shooting. Contreras was present for at least part of this explanation and said nothing. When Contreras returned the next morning with his mother, Calderon repeated the story, stating they went to collect some money but the guy refused to pay and began closing the door. Calderon pushed the door open and started stabbing the guy while Contreras started shooting. Contreras, again, said nothing.

At the prosecution's request, the trial court allowed Gonzalez to relate the foregoing to the jury under the party admission (Evid. Code, § 1220), statements against penal interest (*id.*, § 1230), and adoptive admission (*id.*, § 1221) exceptions to the hearsay rule. In response, Contreras sought to introduce Calderon's statements to law enforcement in March 2005 and October 2006 in the defense case in chief. The prosecutor objected to the admission of these interviews in their entirety, asserting that Calderon's statements constituted hearsay. Defense counsel argued that Calderon's statements were admissible to the extent they were against his penal interest (*id.*, § 1230) and/or inconsistent with his statements already related by Gonzalez (*id.*, § 1202). The court deferred ruling on the issue until it had an opportunity to review the interview transcripts.

The next day, the court agreed that Contreras could present Calderon's statements to law enforcement that were inconsistent with his statements to Gonzalez and Contreras's mother, as related by Gonzalez. As for the against-penal-interest theory, the court did not see any such statements in the transcripts, since the story Calderon told law enforcement minimized his culpability. The court nevertheless invited defense counsel to identify any

19

such statements that it might have missed. Counsel agreed there were no such statements and offered no other theories of admissibility.

At trial, Contreras called Detective McDonald and a DA investigator to recount what Calderon said about the shooting, to the extent it differed from what Calderon said in front of Gonzalez. As set forth above, this included his statements that he discovered Contreras and the man inside the apartment arguing about money, and that he tried taking the rifle when Contreras started shooting but was shot himself.

Under the inconsistent-statement theory, however, Contreras could not present the portions of Calderon's statements discussing "Tito." Although Gonzalez saw an older, bald, "heavyset" man—whose name she did not know but thought might have also been Victor—with Contreras and Calderon in the yard, Calderon never mentioned Tito or any third accomplice in the account related by Gonzalez.

After the jury returned its verdict, Contreras moved for a new trial, arguing, in part, that the trial court denied his right to confrontation by allowing Gonzalez to repeat Calderon's hearsay statements while limiting his ability to impeach Calderon with his later statements to law enforcement. Contreras again highlighted the fact that he could not present evidence that "Tito" was at the scene of the shooting. The trial court denied the motion, noting that the admissibility of Calderon's various statements was thoroughly discussed and carefully decided before and during trial.

On appeal, Contreras does not contest the trial court's application of the inconsistent-statement theory. Relying on *People v. Conrad* (2006) 145 Cal.App.4th 1175 and *People v. Booth* (2016) 3 Cal.App.5th 1284, he instead argues he was entitled to introduce Calderon's complete statements as a remedy for the delayed prosecution. In *Conrad*, the trial court dismissed the

case because a defense witness died during a delay in the prosecution, for which the prosecutor offered no explanation or justification. (*Conrad*, at p. 1182.) The prosecution appealed and the appellate court reversed, holding that a remedy less severe than dismissal was warranted because the lost testimony, while material, did not conclusively establish the defendant's innocence. (*Id.* at p. 1186.) The appellate court directed the trial court to instruct the jury as to what the witness would have testified on remand. (*Ibid.*) In *Booth*, the defendant filed a petition for writ of habeas corpus alleging his counsel rendered ineffective assistance in failing to file a motion to dismiss based on pre-charging delay. (*Booth*, at p. 1301.) The appellate court granted the petition, discerning no good reason for defense counsel to forgo the motion, and concluding it was at least reasonably probable the motion would have been granted considering the "substantial" prejudice the defendant suffered—the loss of a witness who would have exonerated him— and the weakness of the prosecution's case. (*Id.* at pp. 1305, 1312.) The appellate court ordered a retrial and directed the trial court to present the new jury with the missing witness's statements to police. (*Id.* at p. 1313.) Unlike in *Conrad* and *Booth*, however, there is no occasion in this case to fashion a lesser remedy because (1) as we have already discussed, Contreras's motion to dismiss was properly denied, and (2) Contreras did not develop this theory in the trial court.

Contreras also suggests that the trial court's hearsay rulings excluding some of Calderon's statements impaired his constitutional right to present a defense. It is well settled, however, that applying the ordinary rules of evidence generally does "not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) In any event, defense counsel was able to argue in closing that a third party could have

21

been the shooter based on Gonzalez's testimony that she saw an older, bald, "heavyset" man in her backyard take a gun from Contreras or Calderon after the shooting. Evidence that "Tito"—who was not necessarily the man Gonzalez saw in the backyard—may have driven Calderon to the apartment complex and/or joined him in attempting to wrestle the rifle away from Contreras would just as likely have undercut rather than strengthen this theory, and most certainly would have left the jury confused.[5]

## C.      *Evidence of Plummer's Prior Violence*

Contreras additionally asserts the trial court abused its discretion and violated his federal and state constitutional rights to confront witnesses, present a defense, and due process of law by excluding certain evidence of Plummer's prior violence, which would have supported his alternative claim of self-defense by suggesting that Plummer was the aggressor.

Specifically, Contreras argues the court should have admitted three pieces of evidence: (1) Rayo's statement to police that she feared Plummer, her older brother; (2) Plummer's history of domestic violence; and (3) some comments Plummer made to Madrid when she attempted to collect payment for the drugs. These were: "I know [Contreras] is here with you, if he wants to come to me it is gonna be a shootout"; "I know he's around here somewhere. Why don't you tell him to ask me for it? I'll just beat him up"; and "Tell him to come and we'll shoot it out."

---

[5]      In his reply brief, Contreras appears to argue that the trial court should have allowed him to introduce Calderon's interviews in their entirety under the rule of completeness (Evid. Code, § 356). This was not an argument Contreras advanced below. Rather, the trial court noted that *the prosecution* could potentially present additional portions of the law enforcement interviews under that rule.

Before trial, Contreras moved to admit evidence of Plummer's character for violence under Evidence Code section 1103, subdivision (a)(1), to show that he was "looking for a fight" and "want[ed] to do violence" the night of the shooting. The prosecution asked the court to exclude all such evidence on relevance grounds, arguing that Rayo's relationship with her brother was unrelated to the crime, Plummer's past criminal conduct was unknown to Contreras, and there was no evidence that Plummer's remarks to Madrid were ever communicated to Contreras. In addition, the comments were hearsay. On the latter point, Contreras claimed the statements were offered to show Plummer's state of mind at the time of the shooting and therefore were not hearsay (Evid. Code, § 1250).

At the in limine hearing, defense counsel conceded that Rayo's opinions of her brother were irrelevant. As to Plummer's history of domestic violence, the trial court ruled that the evidence was irrelevant, vague, and unduly prejudicial. Regarding Plummer's threatening statements to Madrid, the court determined they were only relevant if there was some evidence that they were communicated to Contreras or that Plummer "was the instigator of the firing at the door."[6] Counsel did not anticipate any such evidence, and none came to light at trial.

At the request of counsel, the trial court instructed the jury on self-defense and imperfect self-defense based on the evidence that Plummer rushed to the door and that the BB gun, which looked like a real gun, was

[6] The Attorney General argues that Contreras forfeited his challenge to the exclusion of the statements to Madrid because he never obtained a final ruling. But the record shows the court initially took the matter under submission and then confirmed its decision to exclude the evidence a day later.

23

found beside his body after the shooting. The court questioned the sufficiency of the evidence to give those instructions, however, especially the lack of evidence that Contreras subjectively believed in the need to defend himself.

On appeal, Contreras very briefly argues that the trial court erred in excluding evidence of Plummer's violent behavior because it was significantly probative. As noted, he conceded that Rayo's fear of Plummer was irrelevant and therefore waived his right to assert error as to that evidence. With respect to Plummer's past domestic violence and his remarks to Madrid, we acknowledge that this kind of evidence can be relevant to show whether the victim was the aggressor in cases involving self-defense. (See *People v. DelRio* (2020) 54 Cal.App.5th 47, 54–55 [evidence of the victim's past domestic violence " 'tends to show that the victim was probably the aggressor' "]; *People v. Romero* (2007) 149 Cal.App.4th 29, 36–38 [self-defense places the victim's state of mind at issue and thus statements reflecting their own mental state may be admitted under Evid. Code, § 1250].)

But here, even assuming the court erred in excluding such evidence, there is no reasonable probability the jury would have accepted the self-defense or imperfect self-defense theories had the evidence been presented. (See *People v. Wright* (1985) 39 Cal.3d 576, 586 [applying *Watson* standard to error in excluding evidence supporting self-defense claim].) "The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the [defendant] must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.) There was no evidence in this case that Contreras actually believed he needed to defend himself. He did not testify at trial and he made no statements to that effect to any other witnesses.

The circumstances of the shooting itself are not exactly clear. But the evidence that was presented does not point to Contreras responding to a perceived threat and actually believing in the need to defend himself. Rangel, Rayo, and Plummer were talking in kitchen when they heard the front door open. Rangel heard no words exchanged, only a bit of "pushing and grunting" like Plummer was trying to push the door closed, and then shots fired. Rangel and Rayo did not see Plummer pull out the BB gun when he rushed to the door. Neighbor Dement testified that she saw Contreras with a gun while he was arguing with Plummer. Calderon, as we know, told multiple versions of what transpired, but Contreras was the aggressor in all of them. As Gonzalez related, Calderon and Contreras started stabbing and shooting Plummer as soon as he opened the door, or as he tried to shut the door on them. Calderon told Detective McDonald, "Right at the door, he started shooting at the people." He similarly told a DA investigator that Contreras was holding the rifle during the argument and then suddenly began shooting. And although Rayo found the inoperative BB gun beside Plummer's body, there was no evidence he ever brandished it. It is entirely possible that the BB gun fell out of his waistband as he was shot to death.

Regardless of whether Plummer had been violent in the past or had an aggressive mental state the night of the shooting, the jury could not find self-defense or imperfect self-defense absent any direct or circumstantial evidence that Contreras actually believed he needed to defend himself against imminent harm from Plummer. Accordingly, any error was harmless.

D. *Jury Question*

Contreras claims the trial court further erred in responding to a note the jury sent out during deliberations. More specifically, on the second full day of deliberations, the jury asked, "Would [Contreras] still be guilty if he

25

did not pull the trigger but the deaths are a direct result of his drug deal gone bad?" The court's response, while indirect, adequately answered the question.

The trial court convened the parties to discuss the note on the record. It proposed to answer the question as follows: "As phrased, this question appears to involve potential factual findings that make the question not answerable. Jurors must first decide what the facts are based on all the evidence that was presented during the trial. Then the jury applies the facts that the jury found to the law as I have given it to you. You may find it helpful to look at CALCRIM 520, but in conjunction with all the other instructions you have been given."

Defense counsel thought it would be better to more directly answer the question, "No." As counsel reasoned, the only theory of homicide liability presented to the jury was that Contreras was the actual shooter; no vicarious theories of liability were given. And the evidence was undisputed that the cause of each victim's death was one or more gunshot wounds. So, if the jury did not find Contreras was the shooter, then he could not be convicted of murder. Counsel believed that directing the jury to review CALCRIM No. 520 would be confusing because "there's no act that anyone could possibly identify where the defendant could have caused the death other than a fatal gunshot."

The court was uncomfortable giving a direct "[n]o" because the question as phrased was predicated on hypothetical factual findings—that Contreras did not pull the trigger but the deaths resulted from the drug deal gone bad—and the court did not want to signal it adopted any such findings. It therefore answered the jury as proposed. The jury reached its verdict the next day.

26

Under section 1138, when a deliberating jury expresses "desire to be informed on any point of law arising in the case . . . the information required must be given . . . ." "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) The primary duty of the court is to make sure the "jurors must *understand* the legal principles they are charged with applying" and "facilitate such an understanding by any available means." (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 250.) While the court is not always required to elaborate on the standard instructions (*Beardslee*, at p. 97), merely repeating "technically correct" legal principles often does "little to insure that jurors can apply the law to a given set of facts" (*Thompkins*, at p. 250). Generally, the court should carefully consider the jury's question, clarify it if necessary, study the applicable legal principles, and respond "in as simple and direct a manner as possible." (*Id*. at p. 253.) We review the decision to provide further instruction for abuse of discretion, and the correctness of any such instruction de novo. (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.)

Here, Contreras insists the court should have simply answered, "No." He maintains that because the prosecution's sole theory of liability was that he was the actual shooter—i.e., no theories of vicarious liability were presented—the court should have instructed the jurors to find him not guilty if they determined he was not the shooter. The answer given, he claims, was confusing and could have encouraged the jury to reconsider a finding that he was not the shooter or convict him despite believing he was not the shooter.

To be sure, "[n]o" would have been the simplest way to respond. But assuming one or more jurors were unsure whether Contreras was the shooter

27

when the note was sent out, the court's answer would have guided them to reach the same conclusion. In its response to the question, the court correctly reminded the jurors that it was their duty to find the facts based on the evidence presented and apply those facts to the law given. (See CALCRIM No. 200.) In suggesting they review CALCRIM No. 520, in conjunction with the other instructions given, the court then focused their attention to the elements of murder, which required them to find Contreras "committed an act that caused the death of another person" and "had a state of mind called malice aforethought" when he acted. Taking these directions together, any juror harboring reasonable doubt as to whether Contreras was the shooter could not have found him guilty of murder because, as defense counsel asserted below, there was "no act that anyone could possibly identify" in the evidence presented at trial "where the defendant could have caused the death other than a fatal gunshot." For that reason, the court's response, while indirect, was not confusing or misleading.

## E. *Cumulative Prejudice*

To the extent there were legal errors, but none of the foregoing claims amounted to prejudicial error, Contreras maintains the asserted errors in combination rendered his trial fundamentally unfair. Because we have generally found no errors, and the one error we assumed was decidedly harmless, there is no basis for finding cumulative prejudice. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305.)

## F. *Duplicative Multiple-Murder Findings*

Contreras lastly contends that two of the three multiple-murder special circumstance (§ 190.2, subd. (a)(3)) findings must be stricken. The Attorney General concedes the issue, and we accept the concession.

28

When a defendant kills multiple people, the prosecution should allege only one multiple-murder special circumstance. (*People v. Jones* (1991) 53 Cal.3d 1115, 1148.) But here, the prosecution alleged three multiple-murder special circumstances, one as to each count of murder, and the jury accordingly returned three true findings on that allegation. The Supreme Court has "consistently found that an error of this nature is harmless," however, and the remedy is to simply strike the superfluous findings. (*Id*. at pp. 1148–1149.) We will do so here.

Contreras suggests that we must further modify the judgment to reflect a single term of LWOP. He is incorrect on this point. When a defendant has been convicted of more than one count of murder in the same proceeding, he may be sentenced to a consecutive term of LWOP as to each count. (§ 190.2, subd. (a)(3); *People v. Garnica* (1994) 29 Cal.App.4th 1558, 1562–1564.)

## DISPOSITION

Two of the multiple-murder special circumstance findings are stricken. In all other respects, the judgment is affirmed.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.

29